Good morning, Your Honors. May it please the Court, my name is Christy Shuto. I represent the petitioner in this case, Ferdinand Rashan. Okay, and if you could, do you have a soft voice, if you could speak up, I would appreciate it. I'll try to raise my voice, Your Honor. Thank you. And now you can say you've raised your voice to a federal judge. Okay. We're here today asking for a second chance to present Mr. Rashan's removal defense case. And I'd like to focus, I think there are three issues in this case. I'd like to focus my argument on the ineffective assistance issue. And then I'll also address the jurisdictional issues over the two subsequent motions after that. Before I go into the ineffective assistance, I'd like to start by speaking a little bit about what it means, what this case means for Mr. Rashan, the petitioner, and his family who are here today in court. I think the family and the petitioner view this as a very serious matter. If the order of voluntary departure reverts into a removal order, there is a strong likelihood that the petitioner will be deported back to Afghanistan. In Afghanistan, his life will be in great danger. He is a member of the Shia Hazara ethnic group, as is the entire family. And in Afghanistan, the Taliban have practiced genocide against this group. They continue to advocate genocide against this group. The United Nations has investigated mass graves containing tens of thousands of Shia Hazara who have been massacred under the Taliban. These country condition reports are in the administrative record. In addition to this danger, just being a member of this group, there's also the fact in this case that the petitioner's father has served our government and the National Security Agency as an interpreter at Guantanamo Bay. And he's interviewed over 100 detained Taliban enemy combatants, over 80 of whom have been released and may be in Afghanistan. And that adds to the danger that the petitioner will face if he's returned to Afghanistan. And then finally, the petitioner also suffers from serious mental illness, and he requires medications. He's able to receive those in this country. Do we have a formal diagnosis of both paranoid schizophrenia and bipolar? Yes, Your Honor, I believe there is that diagnosis. That's the statement in the papers that I've read.  Yes, Your Honor. So both, not merely schizophrenia and not merely bipolar. I believe it is both. The terminology, it was, I believe it is both. Okay. And the names of the medications were somewhat different because I think he was living in Germany for a while. Okay. Addressing the ineffective assistance, I think that all of the reasons that I just mentioned, that petitioner fears returning to Afghanistan, fall under the prejudice prong of ineffective assistance. And they show that he does have a plausible claim for relief in this case. And the more difficult question in this case is the other prong of ineffective assistance, which is competence. And we're here today and we're submitting that counsel's advice in this case, and very importantly the circumstances under which the advice was given, were incompetent. Now, so we're talking here, this is not the ordinary way of incompetence, although it verges on it. Usually, ineffective assistance of counsel means that the lawyer was incompetent. Here there's some statement that he wasn't very good. That is to say that his primary practice was in criminal law, and although he had been recommended to the family as good in immigration law, he was actually just getting going on it. So maybe he wasn't the most competent. But the central allegation seems to be not incompetence, but rather violation of professional responsibility. I think that's correct, Your Honor. And specifically the duty of loyalty and a breach of the duty of loyalty, which is one of the most important duties that we as attorneys owe to our clients. I think it's very important to point out the meeting that transpired between the Petitioner and his counsel prior to the hearing at which he requested voluntary departure. And the Petitioner and his sister submitted declarations showing what transpired at that meeting. And there's several very problematic facts that I would like to draw the Court's attention to, the first of which is that counsel expressed a personal desire and a need to withdraw from the case that morning. And at that point in time, after counsel expresses that desire, there really is a conflict of interest in the voluntary departure deal. And we would ask that the Court view the deal with a very critical eye and ask whether the deal was beneficial to counsel or beneficial to the Petitioner. Some of the other problematic facts are that the Petitioner stated that he was explained that if he accepted voluntary departure, he would easily be able to re-immigrate into this country and come back right away. And it was only after his hearing that it was explained to him it wasn't so easy, that he would face obstacles in coming back. Mr. Chuteau, we have the immigration judge saying the Respondent has not established that Attorney Spire requested voluntary departure on the Respondent's behalf for his own personal reasons and out of a desire to withdraw from the case. There's no evidence in the record that Attorney Spire ever sought to withdraw as counsel of record. Are these recitals a fact by the findings by the district and by the immigration judge that we're in a position to disregard? I believe so, Your Honor. And I think the immigration judge's findings completely disregard the declarations that were submitted in the motion to reopen. And by nature, this is a difficult, ineffective assistance claim because it's addressing what happened outside of the courtroom. I believe the Court can review the agency's decision to see whether there's substantial evidence supporting that decision. And we submit that there isn't substantial evidence. If you look at counsel's response, he was advised of the ineffective assistance claim in detail. And he gave no explanation for why he requested voluntary departure. Another problematic point in this case is that the agency didn't produce a transcript of the hearing or show what transpired exactly at that hearing. Another point I'd like to draw the Court's attention to is the fact that the agency is the unusual nature of requesting voluntary departure for a client who is a lawful resident. And as a deportation defense attorney or a removal defense attorney, voluntary departure is a fairly common form of relief, I'll call it, to request in the immigration court. And I've probably requested it dozens of times. I've never seen it requested by myself or another attorney for someone who is a lawful resident of this country. They have so much to lose by giving up their case. And as I understand it, the two claims that he really had before they were given up by agreeing to voluntary departure were, number one, that he wasn't removable at all. Now, he'd already lost that in front of the IJA, but that was, of course, available to him to appeal to the BIA and then potentially petition for review to this Court. And he also had an asylum claim, assuming he was removable, and that asylum claim was what he thought he was about to present to the IJA when, according to his declaration, his then-attorney says, no, you're better off just getting voluntary departure. My wife is ill and I can't continue to be your lawyer. Am I right that those are the two claims that he's really got? Yes, Your Honor. And that he's given up by taking his voluntary departure? Absolutely. All right. What do I make of the fact that to the degree that the IJA had evidence before him with respect to what happened, and there's to say that conversation between the lawyer and the petitioner and his father, that what we have here is a declaration by the petitioner. We also have a sworn affidavit from his sister, who knew a lot about the case, although she was not present at that particular conversation. The countervailing evidence in favor of the attorney's story is a very short letter from the attorney to, I think, to the sister. Is there some evidentiary importance we should attach to the form in which this evidence is coming in? Obviously where I'm going is that I'm inclined to think that a sworn declaration and a formal declaration should be entitled to somewhat greater evidentiary importance than the letter from Mr. Speier of April 10th to you. I absolutely agree with that, Your Honor. And I would also point out that the letter from Mr. Speier didn't give a good explanation or even a tactical reason for why voluntary departure was requested. And in this case where his client faced so much danger in Afghanistan and had no place to go to, there was a very plausible removal defense, so that it was an effective assistance to advise and to request voluntary departure. Now, is there anything in the record, I see I have the letter from Mr. Speier here in front of me, which does not deny the statement in the declaration from the petitioner that he said my wife is ill and I need to withdraw? That's not denied in this letter. Is there any place else in the record where Mr. Speier denies that? Absolutely not, Your Honor. So in the record we have no denial of that statement? That's correct. Okay. I'd also like to address the jurisdictional issue over the subsequent motion to reopen that was filed once the case was appealed to the Board of Immigration Appeals, the BIA, and the motion to reconsider. May I ask you one more question before you go there? The immigration judge recites that the government states that Attorney Speier was a very zealous advocate for the Respondent and that the Respondent's allegations are not supported by the record. Do I take that, do you take that as referring to the April 24 declaration of Ms. Klein, in which she, in two paragraphs, relates Speier's advocating over the phone? Do you take it that that was what the immigration judge was referring to, or is there some other government recital of zealous advocacy? Your Honor, in this record, it's a little difficult because you don't have the transcript. I think perhaps the judge may have been referring to that letter written by Ms. Klein. It's possible he was referring to other hearings. I'm not sure. I see. All right. There's nothing specific that you can direct us to other than the Klein letter. Would that be characterizing Speier's advocacy? No, Your Honor. All right. Now, it's very clear from the record that one of the things Speier did was to advocate for the exercise, advocate outside the courtroom of the IJ, to advocate for the exercise of prosecutorial discretion so that the government would not, in fact, pursue this. This is an odd question to ask you in this forum because we're not taking evidence and so on. But we all, as judges, have had some experience with immigration cases. So I have some sense as to how often the government, once it gets started in an immigration removal case, exercises prosecutorial discretion to the advantage of the person about to be or the person against whom they're seeking removal or earlier deportation. What has been your experience as a practitioner in this area as to how likely it is that when the case gets to this point that there will be an exercise of prosecutorial discretion in favor of your client? I've never seen it before, Your Honor, and I have requested it numerous times. I've never seen prosecutorial discretion exercised. What occurs to me is that we know from the sister's affidavit that his primary expertise, or maybe I should say we know it is stated in her affidavit that he was recommended to them, but they knew at the time that his primary expertise was in criminal law. And it's quite well known that a good part of the practice of a successful criminal defense lawyer is asking for prosecutorial discretion, for example, before the indictment is brought down. And it occurs to me that maybe what he's thinking is that this is like a criminal practice. I think that's an excellent point. That may be the case here. I certainly wouldn't choose to pursue prosecutorial discretion in many cases. It seems so hard to achieve. Is there any explanation for the numerous continuances sought by Mr. Speier? I think by the time he's showing up for what turns out then not to be the asylum hearing, this is the seventh time this case has been set in front of the IJ. Have I got that number right? I think that's correct, Your Honor. I lost track of the number of hearings, and I wasn't able to find an explanation for why there were so many. Okay. Any other questions? If I may just briefly address the jurisdictional issue over the second motion to reopen that was filed at the Board of Immigration Appeals and then also the motion to reconsider. And our position on those two motions is simple. Our position is that under the Blackletter law, a motion to reopen or a motion to reconsider is an entirely different right from the statutory right of appeal, and that while in accepting pre-conclusion voluntary departure, the petitioner stated that he would waive appeal, he did not state that he would waive the right to file a motion to reopen or a motion to reconsider. And I believe the agency's position is somewhat inconsistent because they assume jurisdiction over the first motion to reopen, both the immigration judge and the Board of Immigration Appeals. And then they state that there's no jurisdiction over the latter two motions. At this point, I think we've got your argument in hand. Let's hear from the government, and then you've got some time to respond. Thank you, Your Honor. Thank you. May it please the Court, my name is Jacob Basharoff, and I'm here on behalf of the Attorney General of the United States. The standard for review in this case that involves denial of motion to reopen is abuse of discretion, which is a highly differential standard of review. What I would like to focus on is I would like to focus on that, this discussion, on the tactical decision. Let me come back to the standard of review for just a moment. We see a lot of motions to reopen after we've had a final decision. I mean, that's the normal way we see them. That is to say the IJ has done what the IJ did, usually deny relief. There's an appeal to the BIA. The BIA typically then affirms. And then there's a motion to reopen after a completed proceeding. This, however, is a motion to reopen a proceeding that was abandoned midstream. Should we apply the same standard of review in that instance? You know, when we look at a motion to reopen, I hold the government's position probably that it is applicable here because it's the agency's review of a motion to reopen. And the evidence that was submitted to the BIA was pretty much the same evidence as was submitted to the immigration judge in the removal proceedings. So the standard of review should be the same, which is now the most of your discretion. What's the harm of reopening to say to the IJ and the BIA, you know, we think this proceeding was unfairly truncated. There are a couple of plausible claims. I'm not sure whether they're winning claims. And why don't you just adjudicate them on the merits, and then everyone can be content that we've actually had an adjudication on the merits of the claims. What's the harm in doing that? Well, the general position in this regard is that when, and if I may start with voluntary departure, pre-conclusion voluntary departure, when aliens ask for pre-conclusion voluntary departure, they give up important rights. And they have their rights to appeal, and they consider their removability. In this case, Petitioner was found to be removable because he was convicted in Superior Court for the State of California, San Diego County, for assaulting his family members and for failure to comply with a court order. The immigration judge sustained defying that Petitioner failed to comply with a court order, and Petitioner conceded to that. If an alien in a similar position would be given the opportunity to collaterally go and attack this conviction and then come back to the court and then litigate it, then they will now get removed. I mean, it's not that in this particular case that Petitioner, who, well, first he was found that he committed a crime, and second, he would consider his removability. Nothing on the record also suggests that when he waived his appeal, his waiver was not done knowingly and intelligently. Nothing on the record suggests that. So I think you're quite wrong when you say nothing on the record suggests that. There's a great deal on the record that suggests that. The I.J. ruled in the government's favor on this point. But all you have to do is read his declaration, and it says he did not understand at all what was going on. You can read his sister's declaration that says he was having a manic episode at the time. You can't, you simply can't say that there's nothing on the record to suggest this. Well, besides, let me clarify the government's position. It's not that nothing on the record suggests that, that there was nothing wrong as to Petitioner's psychological state. But nothing on the record suggests that when Petitioner made his, when he waived his rights to appeal and consider removability, nothing on the record suggests that he was not in his right mind. I mean, I mean, it's not. Now, not in his right, you know, you again misstate the record. His sister states very carefully, very precisely that he was having a manic episode. Now, the ordinary meaning of a manic episode for someone who is bipolar means at the time of the manic episode is precisely that he is not in his right mind. But his sister was not there. He was present at the proceedings with his father. And that's why I was. I understand that. But I'm coming back to the point, you cannot say there's nothing in the record to suggest that he was not in his right mind. Well. What you say goes to the evidentiary weight. If that's a problem with the Court, I would like to withdraw the wording of the government's, the government's characterization, there is nothing on the record. I believe that there is nothing that would suggest that petitioner was not able to make a reasoned decision. Let me put it this way. I mean, she was not there. I don't think you're taking my point. He's quite able to make a reasoned decision at various points. But unless you, maybe the problem is you don't understand what a manic episode is for a person who's bipolar. A person who's in the middle of a manic episode for a bipolar is largely incapable of making reasoned decisions. But what I was trying to say is that there is no evidence. His father was present with him at the proceedings, at the final proceedings when he requested voluntary deportation. And in his father's declaration, from his father's declaration and the way the government views it, it is not clear that he was having a manic episode. His psychologist's report suggests that if he takes medication, he's capable of making reasoned decisions. He's capable of having a normal life. And his reasoning was focused. He's able to do that if he takes medication. I'm not arguing, and I would not like it to be taken that I'm not sympathetic to the petition. I'm not trying to argue that. But I'm just saying that if he takes medication, if he takes care of his responsibility, he's poor. I'm sorry. I'm sorry. Are you saying there's some recital that he had medication? Excuse me? You said if he takes medication, he's fine. That's what the report says. Judge Fletcher has been pointing out that there's a recital that he was having a manic episode. Are you saying that he could not have been taking, could not have had a manic episode because he must have been taking medication or what? I cannot speculate to that. I'm not a doctor. I cannot speculate to that. What I was trying to say is that when we're talking when he and talking when he requests a voluntary departure, it is not clear that he had a manic episode. I don't see him having a manic episode. His father was there, and how come his father's declaration is soundness to that? His father's declaration was not addressed to that issue, set of issues at all, was it? It wasn't his father. Are we talking about the same declaration in which his father talked about the dangers to the son that would be encountered in Afghanistan, and most particularly because of the father's own role in working for the United States and the dangers that the Taliban would have for his son? There's nothing in there that would relate one way or another to his son's psychological condition. I'm talking about the father's declaration that was submitted as to the events that transpired at the final hearing. That's what I'm driving at. And that was submitted in support of the motion to reopen. And that's what I'm trying to... Were there two declarations from the father? Maybe you're talking about... No, I'm not talking about any filing point, no. You're not talking about the one at page 90? Courts and Gardens. Paragraph 20 refers to his son's mental condition, makes him more likely to succumb to torture, but that relates to... That's what I'm talking about. 1-0-9? It seems to me that we're talking about different contexts. I'm talking about the proceedings, and if the question is whether his father... I mean, his father's statement about his son's mental condition, I'm not... The government is not disputing that he's... You know, there's a psychological... That petitioner has a psychological problem. We're not disputing that. I think we're asking you, is there more than one declaration by the father? And 1-0-9 appears to be a letter addressed to Ms. Rogers, the San Diego district attorney. Yes, Your Honor. There's another one on administrative record and starting on page 90, if you look at that. No, that's, in fact, the one that we were looking at. And there's another one that was submitted to the district attorney on administrative record, page 1-0-9, which was... That's not a declaration of the father. That's a letter. That's a letter. So I just want to make sure that I'm talking about the declaration of Mr. Nehan, the petitioner's father. Yes. So I was talking about... No, I need to back up and make sure what we're talking about. Yes, Your Honor. You made the point to which Judge Pollack responded. The point you were seeking to make was the father was present in the interview between, among himself, his son, and the then lawyer. And you made the point that despite having been there and despite the fact that the sister says that at that time the son was suffering from a manic episode, the father says nothing in the declaration about the manic episode. And Judge Pollack responded, but the father's declaration is addressed to an entirely different point, which is to say the danger he would face if he were to go back to Afghanistan. And you then seem to be talking about the father having said something else, and we asked you if there's another declaration from the father. I think the answer is no. The answer is no. That's correct, Your Honor. I thought you were asking about the latter, and I construed it as you were talking about a declaration. I'm sorry. I misconstrued as to what you said. As far as addressing the father's declaration, this declaration was submitted in support of the motion to reopen. The petitioner filed an asylum application. There is no relief pending. Once he opted out for a pre-conclusion voluntary departure, he waived his rights to appeal and considered his removability. There's nothing left that the board or the immigration judge at that point could have adjudicated. Unless it reopens. That's correct, Your Honor. And that's what he wants. Another point that I would like to make is that the petitioner was a local permanent resident of Germany for 13 years prior to moving to the United States. And the relevance of that is? The relevance of that is that it's not clear whether he's still a local permanent resident of Germany. It's not necessarily he would be removed to Afghanistan in the first place. I mean, he can go back to Germany. But the legal relevance of that is? The legal relevance, there was a claim that he was supposed to, well, the allegation was that he would be removed to Afghanistan and then he would be subject to persecution and torture on account of him being Hazara Shia minority by the Taliban. But does that mean that he does not have a plausible claim for asylum and, therefore, doesn't satisfy the standard of prejudice that must be satisfied once we find an effective assistance of counsel? It was, as far as, well, it seems to be, it's all tied up whether if his case was to be reopened, then it would be something that the immigration judge would have to adjudicate. Of course. Of course. At this particular point, it's not, I mean, it would be speculative of me to say whether he has a plausible claim or doesn't have a plausible claim. So it wouldn't be fair for me to say that he might have a plausible claim, he might not. But the standard for us on deciding whether or not he satisfied the standard for showing ineffective assistance of counsel has two prongs, as I understand it. One, he has to show that the level of performance falls below a certain level, and then he has to show prejudice. And prejudice, as I understand the law, is that he has to show that he has a plausible claim that he would have succeeded absent the ineffective assistance of counsel. He needs shown nothing more than plausibility on that claim. Well, as far as, and this particular question has to show that he has a, he will be able to establish prima facie eligibility for relief of asylum or whatever he is applying for, as in this case. So I agree with the Court's determination. I would like also to point out that because Petitioner also failed to exhaust his appeal of the waiver, let me put it this way, Petitioner failed to exhaust his, his voluntariness of the waiver. He failed to exhaust waiver of appeal in this matter when he considered, when he considered his removability and waived appeal when he applied for pre-conclusion voluntary departure. And this Boar's petition in this case, from appealing any issues that might be exhausted  Does this go to the contention that the Board is without jurisdiction to entertain a motion to reopen? That's right. Well, there's It's hard for me to imagine why a tribunal would want to so construe its narrow jurisdiction. Where a contention is made by, as in this case, that there's been such a radical shift of events in Afghanistan as to, as to create situations of acute peril such as described by the father. The claim was made, the claim was made by the Board, but the Board was without jurisdiction to, to consider the evidence that was provided. So it's not really clear as to, you know, not, it's just a claim as to what transpired in Afghanistan at this particular point. I was unable to determine, certainly not from the BIA's recital, as to, as to what the rationale was for saying that it didn't have jurisdiction. Or why, or why a tribunal would want to so conceive itself as so narrow. Well, because he, when he, when he asked for, when he asked for pre-conclusion voluntary departure, he waived his appeal of any and all issues. I understand that. And then, thus, he effectively prevented himself from exhausting any and all issues that he might have in the underlying proceedings, including his relief, application for relief for Assad. Mr. Basharov, I was about to say you and I are both lawyers. Maybe I should forego that for myself, but you are. An appeal certainly connotes the notion that, that you are addressing what you would conceive to be an error in proceedings below. And, and you waive a right to appeal by saying, all right, I'm satisfied with what happened below. But surely that's a very different scenario from after you're having waived any objection to the proceedings below. Suddenly, events transpire in the country to which you've agreed to go under the threat of removal if you don't voluntarily depart. And, and the whole, the whole scenario is so radically changed that you would hope that an agency of the United States that was regarded as concerned with the rights of persons in the, in this set of limbo's, would be able to recognize that the Taliban were now controlling large areas of Afghanistan. Or if you wish to change the scenario, Burma today is a very different country than it was four days ago. And you would hope that that kind of change, radical change in the scene could, could help the BIA to say, yeah, we'll certainly look at it again. A set of new circumstances that don't relate to events that took place below in the adjudication. No? Well, it seems to, I, I, I, I agree with, with what you just said. But what happened here is that he pre-opted for voluntary departure. Pre-conclusion voluntary departure. He gave up any and all rights that he had to request relief from the United States government. And that's basically what I'm, what, what, what, that's, what, that's what basically they, that's the, that's the agency's position. When, and he also did not change the voluntariness of his waiver repeal. Nothing on the record suggests, I won't say that nothing is on the record, because I would say that it is questionable that his waiver, his personal, when he waived it himself, it was not freely involuntary. Nothing suggests that. He waived it, but he never appealed that waiver. When one, and, and the case, and let's, let's, let's analogize it. Criminal proceedings when you plead guilty and you waive your, any and all rights that you have, I mean, it will be then very easy to go around and attack that, that waiver and say, well, it wasn't freely voluntary. I mean, there's certain, there's certain rules that one has to follow in order to get to the, the, the initial charge. See, you're not saying, are you, that the, that the regulation cited by the BIA requires such a construction, HCFR 124026B1B, the language of the regulation doesn't call for that, does it? What I, what I, what I was, what I was suggesting, I was suggesting before we even get to the agency's denial of Petitioner's motion to reopen, because they found that they have no jurisdiction, the, the, the first step that we need to take, we need to look at his waiver of appeal, whether it was knowingly and intelligently. And nothing in the record suggests that it wasn't. It wasn't, it wasn't, he gave up his rights, and his attorney made a tactical decision. So that's the point. I won't, I won't beat the dead horse about nothing in the record suggests. There's a great deal in the record that suggests that he did not have a fully intelligent, knowing and intelligent waiver at the time that he did this. Let me ask you a different question. Yes, Your Honor. At the time that he met with Attorney Spire and his father, and Attorney Spire, in some form, I won't now specify because there's some dispute about this, nor appears to be, persuaded him to agree to seek pre-conclusion voluntary departure. Was he incarcerated at that time? Yes, Your Honor. He was, I believe at that time he was detained by the immigration authorities. And then I believe that's what, I just want to make sure that. I'll give you the reason for my, the foundation for my question. I'm looking at the IJ's order. It's administrative record page 142, it's page 2 of the IJ's order. This is now in about the middle of the second full paragraph. The IJ is just recounting the hearing at which the withdrawal of the asylum application took place and the acceptance of voluntary departure. The IJ writes, The respondent indicated that he understood the consequences of accepting pre-conclusion voluntary departure, stating that he had 60 days to leave America, close quote. He also asked, quote, they won't take me back to CCA, that is to say the East Mesa Detention Facility, question mark. Well, so he's obviously worried about whether or not he's headed back to some form of incarceration. Do we know how long he was detained? Do we know whether he was detained at the time, you know, immediately prior to this hearing? What do we know about the detention? He was initially detained by the DHS, and then he was released on bail. He, as I mean, my review of the record shows that he was not detained at the time of him asking for pre-conclusion voluntary departure. But he had been detained for a certain period. He was detained. And do we know from the record how long he was detained? I cannot tell you off the top of my head. But I believe he was detained for some time, and then he, attorney, well, Mr. Spain helped him to bail out, I believe. Okay. I also would like to. Counsel, Judge Gould, I have one question. If he had ineffective assistance of his counsel, does that make his waiver unknowing or unintelligent? You know, does that initiate the waiver? If he had ineffective assistance of counsel and if during the representation that he received by that attorney, his attorney made misstatements as to the validity of voluntary departure and the consequences, then it certainly did affect his ability to make this decision. And then it definitely would affect his ability to make freely and voluntarily. Okay. Wait, wait, wait. Doesn't the case turn on whether he had IAC, ineffective assistance of counsel, and whether there was prejudice from that? And if there was, then his waiver is kind of out the window, right? That's correct, Your Honor. So if his lawyer said, you have no chance on asylum, and you have no problems ever with voluntary departure, and if that's ineffective, then we shouldn't worry about his waiver. That's correct, Your Honor. But the government's position that his lawyer was not, and in fact, he did his job. He provided. He was effective in what he did. The government's position is that the claim, the petitioner's claim that he received ineffective assistance of counsel is simply not supported by the record. Okay. Thank you. Oh, I'm sorry. No, go ahead. I just wanted to be sure before you sit down, Mr. Bresheroff, that since I've taken up a lot of your time both on this appeal and the immediately preceding one in the Jew case, asking you questions which the pertinence of which may not have seemed evident to you, and you've carried the banner of the government valiantly in the face of my questions, I just want you to do me the favor when you get back to Washington and tell General Mukasey that I think you're entitled to double time. Thank you. Your Honor, you asked about Ms. Klein's letter, and I believe she described Mr. Space's performance in her opposition to petitioner's motion and three open proceedings based on ineffective assistance of counsel on its administrative record, page 167. And, however, there is no, to my knowledge, in review of the record, it doesn't show there's another letter or anything that would indicate that she wrote a separate letter as to that. 167? 167, Your Honor. I don't think I have that. I'm sorry. I don't have that. I just, you asked. Yes, of course. As petitioner's counsel, I just would like to direct the Court's attention to that. In conclusion, I would like to say that the agency did not abuse its discretion when it denied petitioner's motion to reopen. And if you don't have any questions, I would like to be excused this time. Okay. Thank you. Thank you, sir. Any questions? Okay. Thank you. The galvanizer is up. Okay, thank you. And response? I was just going to point out the form that shows the release date, which is in the record, if it's of any interest. It's on page 294 of the record. It stated October 12, 2005. 294, did you say? Yes, your Honor. Okay, bear with me now. Okay, I have page, at least I think I have page 294. Well, I have a page that doesn't have a number, but it's in between 293 and 295. Okay. And so what's that page going to tell us? It's Exhibit 11, Administrative Record 294, and it's a form labeled Notice of Relief and Proof of Service. And it's a form that they put in the record any time anyone is released from detention. And I'll submit. Hang on a second. Help me translate this document. I have the date at the top of the document, which says October 12, 2005. And is that the date of the release? Yes, your Honor. And when is that in relation to the date at which he met with his father and Mr. Speier and the date at which they then withdrew the asylum application? That was the spring of the following year. I can't remember the exact date. So he was not currently incarcerated at the time he met with his father and the attorney? That's correct. Okay. Unless there are any other questions, I'll see you. Okay. Thank you very much, Counsel. It's good. I should ask to make sure no questions, no further questions from the bench. Okay. Thank you very much. The case, Sean Nahab v. Mukasey, is now submitted for decision. That concludes our argument calendar for the day. We'll recess until tomorrow morning. Thank all counsel.
judges: Fletcher, Gould, Pollak